USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1381 UNITED STATES OF AMERICA, Appellee, v. TERRENCE TAYLOR, Defendant, Appellant. __________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, Senior U.S. District Judge] __________________________ __________________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Selya, Circuit Judge. _____________ __________________________ Judith H. Mizner, by appointment of the court, for ___________________ appellant. Kimberly S. Budd, Assistant United States Attorney, with __________________ whom Donald K. Stern, United States Attorney, was on brief, for _______________ the United States. _________________________ May 17, 1995 _________________________  SELYA, Circuit Judge. A jury convicted defendant- SELYA, Circuit Judge. _____________ appellant Terrence Taylor on charges that he twice had robbed federally insured banks, and had carried a firearm during and in relation to the second robbery.1 Deterrating no reversible error, we affirm. I. BACKGROUND I. BACKGROUND Following accepted practice in criminal cases that involve questions of evidentiary sufficiency, see, e.g., United ___ ____ ______ States v. Echeverri, 982 F.2d 675, 676 (1st Cir. 1993); United ______ _________ ______ States v. Maraj, 947 F.2d 520, 522 (1st Cir. 1991), we limn the ______ _____  ____________________ 1The applicable statutes provide in pertinent part: Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another . . . any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any [federally insured] bank . . . [shall be punished as provided by law]. 18 U.S.C. 2113(a) (1988). Whoever, in committing, or in attempting to commit, any offense defined in [ 2113(a)], assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be [punished as provided by law]. 18 U.S.C. 2113(d) (1988). Whoever, during and in relation to any crime of violence . . . for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall . . . be [subjected to additional punishment]. 18 U.S.C. 924(c)(1) (1988). 2 facts in the light most congenial to the government. Appellant and Arnett Lynch, an inveterate bank robber, often used drugs at a hangout in Boston, known euphemistically as "the Spot." On several occasions appellant, emphasizing that he "wanted to learn the ropes," expressed the hope that Lynch would provide tutelage in how to rob banks. The problem with wishes is that they sometimes come true. Cf. Aesop, The Old Man and Death (circa 550 B.C.) ___ _________________________ (predicting that "[w]e would often be sorry if our wishes were gratified"). On January 29, 1992, appellant restated his aspirations and mentioned the availability of transportation, telling Lynch that his friend, Lucille Aulmond, had agreed (for ten dollars) to drive him to the downtown area. Lynch and Taylor entered Aulmond's automobile. During the trip, Lynch told appellant that they were going to "do bizank" [a slang term for "bank," according to Lynch's trial testimony] and "rob the 2T's" [a reference to two tellers]. After dropping off a friend, Aulmond, on Lynch's instructions, drove to downtown Boston and parked near the intersection of Clarendon St. and Newbury St. Lynch walked to the corner to check a branch office of Bank of Boston, but found that it had closed for the day.2 When Lynch returned to the vicinity of the parked car, appellant joined him on the sidewalk. The two men then entered a nearby branch of United States Trust Company  ____________________ 2That bank had been robbed several days earlier by Lynch's compatriot, William Corgain, who told Lynch that the bank was easy pickings because only two tellers were on duty. 3 (UST). Appellant remained hard by the entrance, watching both the bank's interior and the street. Meanwhile, Lynch strode to the center of the lobby. The manager, Elizabeth Nentwig, asked Lynch if he needed assistance. Lynch proved capable of helping himself; he drew a gun and advised Nentwig that a robbery had begun. Lynch then grabbed a customer's briefcase, approached a teller (Helen Huppoch), and demanded money. He received $2,748 from Huppoch and inserted it into the briefcase. Appellant yelled, "come on, let's go," and the two men sprinted to Aulmond's car. Once inside the automobile, Aulmond asked what had happened, and appellant responded: "I hit a guy in the face. I punched a guy in the face." Lynch screamed at Aulmond to stop talking and start driving. She complied. After Aulmond made a wrong turn, the men grew impatient, bolted from her vehicle, and completed their escape in a taxi. They then split the spoils, but, there being scant honor among thieves, four men later mugged Lynch and stole his share of the proceeds. The next day, a man subsequently identified by percipient witnesses as Taylor entered a BayBank branch located at 285 Huntington Ave. in Boston. The man approached a teller's station, shoved aside a customer, Alaina Gurski, and, threatening to shoot Gurski, demanded that the teller, Raya Aruin, hand over her money. The man held an object that both Aruin and Ellen Clavin, a customer service representative working at a nearby 4 teller station, described at trial as a gun. The robber fled after receiving $2,458 from Aruin. In due season, a federal grand jury indicted appellant for his role in the two robberies. The superseding indictment contained three counts: count 1 charged Taylor and Lynch with committing the UST robbery; count 2 charged Taylor with committing the BayBank robbery; and count 3 charged Taylor with carrying a firearm during and in relation to the BayBank robbery. Lynch entered into a plea agreement and Taylor stood trial alone. The jury found him guilty on all three counts. Following imposition of sentence, Taylor filed this timely appeal. Taylor's brief contains seven distinct assignments of error. Six of these asseverations relating, vacuously, to the joinder of counts arising from two separate robberies, the sufficiency of the evidence, and the jury instructions do not necessitate exegetic treatment. We dispose of these six claims in a decurtate fashion (see infra Parts III - V). We then turn ___ _____ to appellant's most vexing point: his complaint that the prosecutor's closing argument contained improper and prejudicial misstatements, including impermissible comments on his election not to testify. See infra Part VI. ___ _____ II. THE RAISE-OR-WAIVE RULE II. THE RAISE-OR-WAIVE RULE Because many of the assigned errors were not preserved for appeal by timely objections, we pause first to discuss the raise-or-waive rule. In general, the law ministers to the vigilant, not to those who sleep upon perceptible rights. 5 Consequently, a litigant who deems himself aggrieved by what he considers to be an improper occurrence in the course of trial or an erroneous ruling by the trial judge ordinarily must object then and there, or forfeit any right to complain at a later time. The policy reasons behind the raise-or-waive rule are rock solid: calling a looming error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. Then, too, the raise-or-waive rule prevents sandbagging; for instance, it precludes a party from making a tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error (or, even worse, planting an error and nurturing the seed as insurance against an infelicitous result). So viewed, the requirement that parties raise contemporaneous objections to improper questions, comments, and the like serves an important purpose in promoting "the balanced and orderly functioning of our adversarial system of justice." United States v. Griffin, 818 F.2d 97, 99-100 (1st. Cir.), cert. ______________ _______ _____ denied, 484 U.S. 844 (1987); accord United States v. Holmquist, ______ ______ ______________ _________ 36 F.3d 154, 168 (1st Cir. 1994), cert. denied, 115 S. Ct. ___ _____ ______ (1995). Despite its strength and salience, the raise-or-waive rule is not absolute. But, rescue missions are restricted to the correction of "plain" errors. See United States v. Olano, 113 S. ___ _____________ _____ Ct. 1770, 1776 (1993); United States v. Mejia-Lozano, 829 F.2d ______________ ____________ 268, 273 (1st Cir. 1987); Griffin, 818 F.2d at 100; see generally _______ ___ _________ Fed. R. Crim. P. 52(b). 6 The plain error doctrine concentrates on "blockbusters," to the exclusion of "the ordinary backfires . . . which may mar a trial record." Griffin, 818 F.2d at 100. Under _______ it, appellate courts will notice unpreserved errors only in the most egregious circumstances. At a bare minimum, therefore, bevues not seasonably brought to the attention of the trial court must, in order to command appellate intervention, "affect[] substantial rights." Fed. R. Crim. P. 52(b). An unpreserved error is deemed plain (and, therefore, to affect substantial rights) only if the reviewing court finds that it skewed the fundamental fairness or basic integrity of the proceeding below in some major respect. See Griffin, 818 F.2d at ___ _______ 100. As the Supreme Court itself has written, the plain error doctrine applies in those circumstances in which, absent appellate intervention, "a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S. 152, 163 n.14 (1982). _____________ _____ Given these parameters, it is not surprising that the jurisprudence of plain error invests substantial discretion in the court of appeals. See Olano, 113 S. Ct. at 1776 (observing ___ _____ that "the decision to correct the forfeited error [rests] within the sound discretion of the Court of Appeals"); United States v. _____________ Whiting, 28 F.3d 1296, 1308 (1st Cir.) (same), cert. denied, 115 _______ _____ ______ S. Ct. 378 (1994). Even when faced with an apparently plain error, an appellate court "has authority to order correction, but is not required to do so." Olano, 113 S. Ct. at 1778. For the _____ most part, this discretion should be exercised sparingly, and 7 should be reserved for the correction of those few errors that "`seriously affect the fairness, integrity or public reputation of the judicial proceedings.'" United States v. Young, 470 U.S. _____________ _____ 1, 15 (1985) (quoting United States v. Atkinson, 297 U.S. 157, ______________ ________ 160 (1936)). III. JOINDER AND SEVERANCE III. JOINDER AND SEVERANCE Appellant excoriates the government for bringing a single indictment that joined a count relating to the UST robbery with two counts relating to the BayBank robbery.3 In a similar vein, he calumnizes the district court for refusing to sever the ostensibly incompatible counts. The chastisement is unwarranted. Although appellant now maintains that the counts were improperly joined, he raises this objection for the first time on appeal. Thus, we afford plain error review. See United States ___ ______________ v. Stackpole, 811 F.2d 689, 693 (1st Cir. 1987). _________ Separate offenses may be joined in the same indictment if the charges are "of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed. R. Crim. P. 8(a). In determining whether counts are properly combined for trial, we historically have considered whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of  ____________________ 3Appellant does not argue that linking the firearms count with the robbery counts formed a basis for a claim of misjoinder. Accordingly, we deem any such argument waived. At any rate, the firearms charge was inextricably intertwined with the second robbery, and could hardly be separated from it. 8 operation, and the time frame in which the charged conduct occurred. See, e.g., United States v. Chambers, 964 F.2d 1250-51 ___ ____ _____________ ________ (1st Cir. 1992); United States v. Gray, 958 F.2d 9, 14 (1st Cir. _____________ ____ 1992). Under the present circumstances, joining the three counts lodged against appellant does not constitute plain error. The two robberies involved the same type of victims (federally insured banks). They were charged under the same statute (18 U.S.C. 2113), took place in the same locale (downtown Boston), and occurred in the same time frame (successive days). Such similarities have routinely been found to justify joinder. See, e.g., Chambers, 964 F.2d at 1250-51 ___ ____ ________ (finding joinder proper when robberies all involved federally insured banks in the greater Boston area and occurred within a ten-week period); Gray, 958 F.2d at 14 (similar). Furthermore, ____ the evidence here suggests that the first robbery was, in effect, a training mission for the second. Therefore, we do not think it would be plain error to conclude that the two robberies were parts of "a common scheme or plan" as that term is used in Rule 8(a). Appellant's contention that the district court erred in refusing to sever the robbery counts, while arguably preserved,4 also lacks force. Though the Criminal Rules empower federal  ____________________ 4It is unclear whether appellant's severance motion which, in terms, did not request that the two bank robbery counts be tried separately properly preserved the severance issue for review. Because severance was not required in any event, we assume for argument's sake that the issue was sufficiently raised in the court below. 9 courts to grant relief from prejudicial joinder of counts in criminal cases, see Fed. R. Crim. P. 14, severance decisions are ___ ordinarily won or lost in the trial court. We will overturn the denial of a motion for severance only for a patent abuse of discretion. See United States v. Pierro, 32 F.3d 611, 616 (1st ___ _____________ ______ Cir. 1994), cert. denied, 115 S. Ct. 919 (1995); United States v. _____ ______ _____________ Natanel, 938 F.2d 302, 308 (1st Cir. 1991), cert. denied, 502 _______ _____ ______ U.S. 1079 (1992). This discretion applies to refusals to sever counts as well as to refusals to separate defendants for purposes of trial. See, e.g., Chambers, 964 F.2d at 1251. Establishing ___ ____ ________ an abuse of discretion usually entails a showing that improper or prejudicial joinder likely "deprived the defendant of a fair trial." United States v. Nason, 9 F.3d 155, 158 (1st Cir. 1993), _____________ _____ cert. denied, 114 S. Ct. 1331 (1994). _____ ______ Appellant faces a high hurdle, given Chambers, Gray, ________ ____ and other cases in which we have upheld the trial court's refusal to sever counts involving multiple bank robberies. He strives to distinguish these cases on the ground that they involved more than two robberies, and, thus, yielded telltale patterns. This argument fails for two reasons. First, common sense indicates that the greater the number of robberies, the greater the danger of prejudice that joinder poses. Second, there is no shortage of sound precedent upholding the joint trial of two and only two robbery counts in a single indictment. See, e.g., United States ___ ____ _____________ v. L'Allier, 838 F.2d 234, 240-41 (7th Cir. 1988); United States ________ _____________ v. Shearer, 606 F.2d 819, 820 (8th Cir. 1979). _______ 10 Apart from this curious slant on the number of incidents, appellant offers no basis for suspecting undue prejudice. His bare allegation that, if the jury were to believe that he was involved in one bank robbery, then it might also (improperly) be led to believe from that fact alone that he was involved in the other, is simply not enough. This type of spillover is standard fare whenever counts involving discrete incidents are linked in a single indictment. We have repeatedly held that such a garden variety side effect, without more, is insufficient to require severance. See United States v. Boylan, ___ _____________ ______ 898 F.2d 230, 246 (1st Cir.) (collecting cases), cert. denied, _____ ______ 498 U.S. 849 (1990). Moreover, the case for prejudice is especially weak in this instance because the district court's jury instructions delineated the separateness of the three counts and made it clear that the jury had to consider each charge on its own merits.5 In sum, we find no plain error in the joinder of the three counts contained in the superseding indictment, and no misuse of discretion in the district court's eschewal of a severance. IV. SUFFICIENCY OF THE EVIDENCE IV. SUFFICIENCY OF THE EVIDENCE Appellant challenges the sufficiency of the evidence in three respects. He says that the proof did not show (1) that he  ____________________ 5We also note that, even if the robberies had been charged in separate indictments, the UST robbery would in all probability have been admissible to prove preparation, plan, or knowledge regarding the BayBank heist. See Fed. R. Evid. 404(b). ___ 11 participated in the UST robbery, (2) that he committed the BayBank robbery, and/or (3) that the perpetrator of the BayBank robbery carried a real gun. In assessing these challenges, we scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt. See Echeverri, 982 F.2d at ___ _________ 677; Maraj, 947 F.2d at 522-23; Boylan, 898 F.2d at 243. _____ ______ On the sufficiency issues, a further obstacle impedes appellant's progress. Where, as here, challenges to evidentiary sufficiency are unpreserved the defendant moved for judgment of acquittal at the end of the prosecution's case, but then failed to renew the motion after presenting evidence on his own behalf a special variant of the raise-or-waive rule applies.6 In such straitened circumstances, an appellate court should stay its hand unless intervention is necessary to prevent a clear and gross injustice. See United States v. McDowell, 918 F.2d 1004, 1010 ___ _____________ ________ (1st Cir. 1990); United States v. Cheung, 836 F.2d 729, 730 n.1 _____________ ______ (1st Cir. 1988) (per curiam); United States v. Greenleaf, 692 ______________ _________ F.2d 182, 185 (1st Cir. 1982), cert. denied, 460 U.S. 1069 _____ ______ (1983). A. The Bank Robberies. A. The Bank Robberies. __________________ Appellant's first two sufficiency challenges can be  ____________________ 6Of course, if a defendant files a timely post-verdict motion under Fed. R. Crim. P. 29(c), he may escape the consequences of his earlier procedural default. See United ___ ______ States v. Castro-Lara, 970 F.2d 976, 980 (1st Cir. 1992). In ______ ___________ this case, appellant proffered no such motion. 12 dispatched with alacrity. The government prosecuted appellant for the UST robbery on the theory that he aided and abetted Lynch's felonious conduct. See 18 U.S.C. 2 (1988).7 The jury ___ convicted him on this basis. Its finding is amply supported. Criminal intent is an important element of aiding and abetting, see United States v. Tarr, 589 F.2d 55, 59 (1st Cir. ___ _____________ ____ 1978), and the supposed lack of any such intent lies at the heart of appellant's challenge. Proof of this element demands a showing that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal. See United States v. Albert, 773 F.2d 386, 390 ___ _____________ ______ (1st Cir. 1985). We hasten to add, however, that this showing may be made wholly on the basis of circumstantial evidence. We believe that the jury could have reached such a conclusion here. Viewed favorably to the government, the evidence suggests that appellant sought Lynch's help in learning to rob banks, furnished transportation so that the two men could rob a bank, discussed the prospect en route, stood watch while Lynch held up the teller, facilitated a joint escape, and shared fifty-fifty in the purloined fruits. These facts firmly underbrace the jury's finding that appellant aided and abetted Lynch in the commission of the robbery. Appellant's challenge to the sufficiency of the  ____________________ 7The statute provides that: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. 2 (1988). 13 evidence that he committed the BayBank robbery is jejune. Two eyewitnesses, Aruin and Clavin, identified him in open court as the perpetrator. Although appellant denigrates their reliability, the jury was plainly entitled to accept the identification and to find that appellant committed the crime. B. The Firearms Count. B. The Firearms Count. __________________ Appellant fares equally poorly in his final challenge to evidentiary sufficiency. The statute of conviction, 18 U.S.C. 924(c), requires proof beyond a reasonable doubt that the person perpetrating the predicate offense used a real gun. See, ___ e.g., United States v. Kirvan, 997 F.2d 963, 966 (1st Cir. 1993). ____ _____________ ______ Appellant tells us that the government failed to prove this essential fact. We do not agree. This court recognized in Kirvan that, in order to ______ convict under section 924(c), the gun must be real, but it "need not be proven to be loaded or operable . . . ." Id. While "a ___ toy or a replica will not do," the prosecution satisfies its burden simply by showing that the gun is a gun. Id. ___ Furthermore, the government's proof on this point need not reach a level of scientific certainty. On the contrary, lay opinion testimony may be employed to propel a finding that an object is in fact a real gun.8 See, e.g., Parker v. United States, 801 ___ ____ ______ _____________  ____________________ 8Kirvan illustrates the point. There, we found it ______ sufficient to justify a conviction that two witnesses identified the object as a gun, and that it made a loud noise when dropped (consistent with it being very heavy). See Kirvan, 997 F.2d at ___ ______ 966-67. 14 F.2d 1382, 1385 (D.C. Cir. 1986), cert. denied, 479 U.S. 1070 _____ ______ (1987); United States v. Jones, 907 F.2d 456, 460 (4th Cir. ______________ _____ 1990), cert. denied, 498 U.S. 1029 (1991).  _____ ______ Silhouetted against this backdrop, appellant's assignment of error pales into insignificance. Three eyewitnesses to the BayBank robbery, each of whom observed the object gripped by appellant at close range, testified that it was a gun. This evidence is enough to allow a rational jury to find that appellant carried a real gun. Accordingly, appellant's conviction under section 924(c) worked no injustice, let alone a clear and gross injustice. V. THE JURY INSTRUCTIONS V. THE JURY INSTRUCTIONS When reviewing a district court's instructions to the jury, we look at the charge as a whole, not in isolated fragments. See Boylan, 898 F.2d at 244; Mejia-Lozano, 829 F.2d ___ ______ ____________ at 272. If no timely objection has been advanced at trial, see ___ Fed. R. Crim. P. 30 (specifying when and how objections to the charge must be taken), even an improper instruction rarely will justify the reversal of a criminal conviction. See Henderson v. ___ _________ Kibbe, 431 U.S. 145, 154 (1977); United States v. Weston, 960 _____ _____________ ______ F.2d 212, 216 (1st Cir. 1992). So it is here. In this instance, the district court warned the jury to take a long, hard look at accomplice testimony.9 In appellant's  ____________________ 9To be exact, the court told the jury that the testimony of an accomplice was "to be scrutinized with particular care because there is an interest that the person had in saying something that 15 current view, the instruction should have been more elaborate; the court should have described the nature of the witness' interest in assuaging the government, told the jurors that their perscrutation of such testimony must be more searching than that afforded to other testimony, and reminded them in the same breath that the government had to prove its points beyond a reasonable doubt. Putting aside the obvious question of whether appellant would have been entitled to such instructions if duly requested, the claimed deficiencies are precisely the type of fine-tuning that is consigned to the scrap heap if not called to the district court's attention in a timeous manner. No matter how critically these alleged shortcomings in the court's charge are evaluated, they cannot conceivably sink to the level of plain error. The raise-or-waive rule also hobbles appellant's remaining complaint about the jury instructions. After noting that the evidence anent eyewitness identification was "straightforward," the judge told the jury: There are some four billion people in the world and in the natural course of things one would expect some of them may look alike. But, on the other hand, an experience such as these witnesses had, may, indeed, make their observation so intense that it is reliable in establishing identity beyond a reasonable doubt. Although appellant could be correct in arguing that, in actuality, an intensely stressful situation is often less accurately remembered than is a more tranquil one, he makes this  ____________________ would be looked on with favor by the government." 16 point at the wrong time and to the wrong court. While the challenged instruction may not be a textbook model, we discern no plain error in it. VI. THE SUMMATION VI. THE SUMMATION Having wended our way across flat, easily negotiated territory, we now reach more problematic turf. Here, the topography features a tripartite claim of error addressed to the government's summation. We start with certain fundamental verities. "A prosecutor is permitted vigorous advocacy, so long as he does not stray into forbidden terrain." Palmariello v. Superintendent of ___________ _________________ M.C.I.-Norfolk, 873 F.2d 491, 494 (1st Cir.), cert. denied, 493 ______________ _____ ______ U.S. 865 (1989). Thus, prosecutors need not pull their punches; they may indeed, they should present their cases to criminal juries zealously. Forcefulness in the pursuit of justice is to be admired rather than condemned. Yet, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). This maxim is ______ ______________ particularly relevant to closing arguments, for such arguments come at an especially delicate point in the trial process and represent the parties' last, best chance to marshal the evidence and persuade the jurors of its import. See, e.g., United States ___ ____ _____________ v. Manning, 23 F.3d 570, 575 (1st Cir. 1994). _______ Of course, a prosecutor's obligation to stay within the pale does not exist in a vacuum. A defendant has a corresponding obligation to protect his own interests. When a defendant 17 defaults on this obligation by failing to make a contemporaneous objection to questionable comments in the prosecution's closing argument, the raise-or-waive rule applies. Afterthought claims of improprieties allegedly occurring during the summation are reviewed under the notably ungenerous plain error standard. Consequently, reversal is justified only if the illegitimate portion of the closing argument "so poisoned the well that the trial's outcome was likely affected." Mejia-Lozano, 829 F.2d at ____________ 274. In determining whether a prosecutor's miscues in final argument require reversal under this hard-to-satisfy standard, this court considers all the attendant circumstances, paying special heed to factors such as (1) the extent to which the prosecutor's conduct is recurrent and/or deliberate; (2) the extent to which the trial judge's instructions insulated the jury against, or palliated, the possibility of unfair prejudice; and (3) the overall strength of the prosecution's case, with particular regard to the likelihood that any prejudice might have affected the jury's judgment. See id.; see also United States v. ___ ___ ___ ____ _____________ Giry, 818 F.2d 120, 133 (1st Cir.), cert. denied, 484 U.S. 855 ____ _____ ______ (1987). Using these criteria, we conclude that none of appellant's claimed errors requires reversal. A. Matters Dehors the Record. A. Matters Dehors the Record. _________________________ Appellant maintains that, during the summation, the prosecutor referred to matters not in evidence. Specifically, the prosecutor gave a less than completely accurate account of 18 the prefatory conversation between appellant and Lynch on January 29. Appellant greeted Lynch, so the prosecutor said, by imploring: "Maestro, show me how it's done." The prosecutor added: "We know that Maestro is Mr. Lynch's nickname. Why? Because he plays the organ in his father's church." Warming to this theme, the prosecutor reiterated the point. He told the jury that, as the two men walked into the UST branch, appellant again said: "Maestro . . . show me the ropes." There was, in fact, no evidence of Lynch's nickname and no evidence that appellant made a request to be shown the ropes as the robbers entered the bank. Withal, there was no _____________________________________ contemporaneous objection, and these canards scarcely justify reversal under the plain error doctrine. Given that Lynch admitted to his vocation as a bank robber, his nickname was wholly irrelevant to the case. Moreover, the prosecutor gave an innocent explanation of the moniker and appellant's own lawyer ________ twice referred to Lynch in front of the jury as "Maestro." As to the second misstatement, there was evidence that appellant made the request ("show me the ropes") previously on the day of the robbery and on at least one earlier occasion. In other words, the substance of the prosecutor's statement was true (although the timing was awry). On whole-record review, we conclude without serious question that the allusions to matters dehors the record were benign. Reversal is totally unwarranted. B. The Prosecutor's Rebuttal. B. The Prosecutor's Rebuttal. _________________________ 19 Next, appellant assails the prosecutor's rebuttal, which, he says, contained a minimum of three peccadilloes, namely, (1) an implication that appellant had alerted the four people who mugged Lynch and stole his booty, (2) a suggestion that Lynch should be believed because he suffered from sickle- cell anemia and had tested positive for HIV, and (3) an intimation that Clavin, during her testimony, lowered her voice "out of fear." These accusations do not withstand scrutiny. The prosecutor made the first of the cited comments without objection and in direct response to defense counsel's argument that Lynch had turned against Taylor because the latter did not come to his aid during the mugging. We have previously expressed our reluctance to find plain error when a prosecutor's remarks are made to rebut specific statements by defense counsel, and are proportionate to that end. See Whiting, 28 F.3d at 1302; Mejia- ___ _______ ______ Lozano, 829 F.2d at 274. Here, our reluctance ripens into ______ outright unwillingness. Similarly, the prosecutor's remarks about Lynch's health drew no contemporaneous objection. Those remarks were obviously designed to rebut the defense argument that Lynch was hoping to earn a reduced sentence by testifying against Taylor. The statement recounted facts in evidence, and did not constitute either vouching or an improper appeal to the jury's sympathies. Finally, the remark about Clavin's demeanor was not out of line. The jury saw and heard her testimony, and 20 could determine for itself her state of mind.10 See, e.g., ___ ____ United States v. Mount, 896 F.2d 612, 625 (1st Cir. 1990) ______________ _____ ("Although it is the jury's job to draw inferences, there is nothing improper in the Government's suggesting which inferences should be drawn."). C. The Fifth Amendment Issue. C. The Fifth Amendment Issue. _________________________ The capstone of appellant's asseverational array is his anguished assertion that the prosecutor's summation contained comments on appellant's election not to testify, in derogation of rights secured to appellant under the Fifth Amendment. We quote the disputed portion of the prosecutor's summation: Is there any evidence that Mr. Taylor said, "Oh, my God, I've been misled. This is not going to be money from his father. I've got to get out of here. I've got to warn my friend, Lucille Aulmond. She gave me rides in the past, but this is something different." He stayed true in his anchor position. Mr. Lynch went up to the window, demanded money. He was very unafraid. Mr. Lynch demanded money that wasn't his. Did Mr. Taylor say: Oh, my God, I'm going to leave this place and warn my friend, Lucille Aulmond? No. He stayed true to that anchor position. And, in fact, he yelled, "Come on, let's go." Lynch points to the door. Mr. Taylor waits there and does he say: Look, just because I'm here, I'm sorry what happened. I didn't know it was going to happen. Is everybody all right? I know who was responsible.  ____________________ 10While defense counsel did not interject a contemporaneous objection during the prosecutor's rebuttal, he did bring this remark to the court's attention at a sidebar conference immediately following the summations. The judge refused to resurrect the matter, stating: "I will leave it. It is up to the jury to make that determination." We agree. 21 He left with the money. . . . When he got back to the car, you heard Lucille Aulmond, and she said, "What happened?" Does he say: Lucille, he robbed a bank; I didn't know it was going to happen; I'm sorry. "I hit a man in the face" was what you got, instead. Not the truth, just another part of the lie . . . . And they drive two blocks away. Mr. Lynch gets out of the car. Does Terrence Taylor stay with his friend? "Lucille, I'm involved in this. You shouldn't have been involved. I didn't even know about it. Let's go to the police and clear this whole thing up." He went with the money. Her job was done. He took the money. . . . Did he take his share of the money and say, "Look, this is not my money; there it is, police, look for bait bills; I'm turning back money; I have nothing to do with this." It is a bedrock principle that a prosecutor may not comment on a defendant's exercise of the right to remain silent. See United States v. Robinson, 485 U.S. 25, 30 (1988); Griffin v. ___ _____________ ________ _______ California, 380 U.S. 609, 615 (1965); United States v. Sepulveda, __________ _____________ _________ 15 F.3d 1161, 1186 (1st Cir. 1993), cert. denied, 114 S. Ct. 2714 _____ ______ (1994). Even an indirect or inferential comment on a defendant's silence can transgress the Fifth Amendment. See, e.g., United ___ ____ ______ States v. Hardy, 37 F.3d 753, 757 (1st Cir. 1994); United States ______ _____ _____________ v. Lavoie, 721 F.2d 407, 408 (1st Cir. 1983), cert. denied, 465 ______ _____ ______ U.S. 1069 (1984). Because "[t]here is no bright line marking the precipice between a legitimate assessment of defense witnesses and an impermissible encroachment upon the accused's silence," Sepulveda, 15 F.3d at 1186, prosecutors must tread carefully on _________ this terrain. A prosecutor who "attempts to define exactly the 22 edge of the precipice approaches at his peril." Rodriguez- __________ Sandoval v. United States, 409 F.2d 529, 531 (1st Cir. 1969). In ________ _____________ evaluating whether a prosecutor has gone too far, we must ask whether, in the particular circumstances of a given case, the language used by the prosecutor appears to have been designed to yield the improper inference, or, if not so designed, whether it was such that jurors would probably interpret it as a commentary on the accused's failure to take the witness stand. See United ___ ______ States v. Glantz, 810 F.2d 316, 322 (1st Cir. 1987), cert. ______ ______ _____ denied, 482 U.S. 929 (1987); United States v. Monaghan, 741 F.2d ______ _____________ ________ 1434, 1437 (D.C. Cir. 1984), cert. denied, 470 U.S. 1085 (1985). _____ ______ Notwithstanding these constraints, no Fifth Amendment violation inheres in comments on a defendant's decision to remain silent in a context outside the legal process. For example, in Lema v. United States, 987 F.2d 48 (1st Cir. 1993), we found ____ ______________ nothing amiss in a prosecutor's observation that the defendant remained silent during two drug transactions. The comment did not transgress the Fifth Amendment because it referred to defendant's silence at the scene of the crime rather than at trial. See id. at 56; see also United States v. Ortiz, 966 F.2d ___ ___ ___ ____ _____________ _____ 707, 714 (1st Cir. 1992) (holding that defendant's silent presence at site of drug transaction "patently implied participation"), cert. denied, 113 S. Ct. 1005 (1993). _____ ______ In this case, the government insists that the challenged statements referred to appellant's silence before, during, and after the UST robbery, not to his silence at trial. 23 When a prosecutor's comments, fairly viewed, are susceptible to two plausible meanings, one of which is unexceptionable and one of which is forbidden, context frequently determines meaning. See Sepulveda, 15 F.3d at 1187; United States v. Lilly, 983 F.2d ___ _________ _____________ _____ 300, 307 (1st Cir. 1992). Where feasible, a reviewing court should construe ambiguity in favor of a proper meaning: [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations. Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974); accord ________ _____________ ______ Lilly, 983 F.2d at 307. This rule of construction has heightened _____ desirability in the absence of a contemporaneous objection for, when the target of the comments does not interrupt and register a timely objection, it seems especially appropriate to "give the arguer the benefit of every plausible interpretation of her words." Sepulveda, 15 F.3d at 1187. We are especially reluctant _________ to "fish in the pool of ambiguity" when, as now, the complaining party failed to bring a dubious comment, easily corrected on proper notice, to the immediate attention of the trial court. Id. at 1188. ___ Evaluated against this benchmark, we do not believe that the quoted remarks trespassed on appellant's Fifth Amendment rights. While a suspicious mind could construe what was said as a comment on appellant's decision not to testify, the prosecutor's words are more plausibly interpreted as a comment on appellant's silence during the commission of the crime. After _____________________________________ 24 all, Taylor had labored to develop a defense based on his lack of foreknowledge concerning Lynch's felonious intent. Appellant's silence throughout the commission of the crime tends to undermine this defense, and the prosecutor's comments were most likely a clumsy effort to seize upon this weakness. We will not paint the lily. Given the absence of a contemporaneous objection, we must cede to the government the benefit of a legitimate, plausible interpretation of the prosecutor's words. On this basis, we hold that the remarks in question did not amount to a constitutionally prohibited comment on appellant's declination to testify at trial. We add that, even if the prosecutor's comments crossed the line, our traditional three-part analysis suggests that reversal would be unwarranted. First, although the comments were repeated several times, there is no reason to conclude that the prosecutor intentionally drew attention to appellant's silence at trial. Second, despite the lack of an objection, the district judge instructed the jury with painstaking care regarding the government's burden of proof, appellant's presumed innocence, and his constitutional right to refrain from testifying. Among other things, the judge admonished that "no adverse inference is to be drawn from his exercise of his election not to take the stand." We are confident that this explicit instruction was sufficient to combat any impermissible inference that might have been drawn from the prosecutor's statements. Last but far from least, see Mejia-Lozano, 829 F.2d ___ ____________ 25 at 274 (explaining that "the strength of the government's case is an important factor in considering the likely effect of borderline rhetoric") the possibility that the comments, even if misconstrued, affected appellant's substantial rights is diminished by the potency of the government's proof. Lynch's testimony was unequivocal and corroborated on many points. Moreover, several witnesses to the UST robbery noted appellant's presence and described his behavior in a way that strongly suggested his complicity in the crime. In view of the substantial evidence against appellant, we find it highly unlikely that the jury could have been swayed by the prosecutor's amphibolous remarks.11 VII. CONCLUSION VII. CONCLUSION We need go no further. For aught that appears, appellant was fairly tried and justly convicted. The judgment below is, therefore, Affirmed. Affirmed. ________  ____________________ 11If this were not enough, the general principles governing plain error review caution us in this case against exercising our discretion in Taylor's behalf. At worst, the prosecutor's comments were veiled and any impermissible implication arising out of them was attenuated. We do not believe that this line of argument could have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." Olano, 113 S. Ct. _____ at 1776 (internal quotation marks omitted). 26