# United States Court of Appeals

## For the First Circuit

No. 05-1872

UNITED STATES OF AMERICA,

Appellee,

v.

DWAYNE J. ANDERSON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella and Lynch, Circuit Judges,
and Young,[*] District Judge.

Peter J. Cyr, with whom Law Offices of Anthony J. Sineni, III, LLC, was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

June 29, 2006

---

[*] Of the District of Massachusetts, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  On October 23, 2003, a one-count indictment was filed in the United States District Court for the District of Maine charging Dwayne J. Anderson with knowingly and intentionally distributing five or more grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  After a two-day jury trial in April 2004, Anderson was convicted and sentenced.  In this appeal, Anderson contests both his conviction and sentence.  After careful consideration, we affirm.

## I.  Background

### A. The offense

On July 31, 2003, Eric Besore ("Besore") contacted Steven Thibodeau ("Thibodeau"), a policeman of eight years' experience, who, at the time, was working for the High-Intensity Drug-Trafficking Task Force (HIDA) of the Drug Enforcement Administration (DEA).  Prior to this contact, Besore had agreed to assist Thibodeau with investigating drug trafficking by providing Thibodeau with information and by making controlled purchases of drugs under Thibodeau's supervision.  In exchange for this assistance, Thibodeau assisted Besore with having a criminal speeding charge dismissed by the state court.  On the morning of July 31, Besore called Thibodeau to say that he might be able to purchase drugs that day from an individual nicknamed "Hoot."

Following a brief phone conversation, Besore agreed to meet with Thibodeau at the DEA office in Portland, Maine to set up

-2-

a controlled purchase. Once Besore arrived, Thibodeau and other agents proceeded to instruct Besore on how they wanted the controlled purchase to take place. They gave Besore $1,000 to purchase the drugs and outfitted him with an electronic transmitting device that looked and sounded like a pager. They told Besore they would be monitoring his conversations. Finally, Thibodeau conducted a pat-down search of Besore to ensure that Besore did not have any drugs or money of his own on his person. Besore's vehicle was also searched.

Once these preliminary steps were completed, Besore set out in his car to Westbrook, Maine to meet Hoot. He was accompanied by an entire surveillance team sent to observe the purchase and ensure his safety. Two members of this team were Thibodeau and Barry Kelly ("Kelly"). Kelly was charged with listening to and recording the transmissions coming from Besore's electronic transmitting device. Thibodeau, driving his own car, followed Besore.

Besore eventually stopped at a parking lot at the corner of King and Brown Streets in Westbrook. To hear the transmissions coming from Besore's electronic transmitting device, Kelly had to be within 200 feet of Besore's car. He therefore parked his own car a block away. Thibodeau, trying to avoid arousing suspicion, moved his car often but kept in contact with Besore by cell phone.

Shortly after arriving at the parking lot in Westbrook, Thibodeau and Kelly noticed that a uniformed Westbrook police officer driving an unmarked cruiser had stopped a car nearby for speeding. Fearing the prospective drug seller might be frightened away by the flashing blue lights, Thibodeau approached the police officer while other surveillance team members kept watch on Besore. At this point, Kelly learned, from monitoring the transmissions, that Hoot planned to meet Besore up the street. Accordingly, Besore moved his car up the street, and Kelly followed.

When Thibodeau finished talking with the police officer, he noticed that Besore's car had moved. However, he heard by radio that Besore was headed to pick up his seller. Moments later, Thibodeau found Besore at an intersection. A green Subaru occupied by a lone female was parked behind Besore; Kelly was parked behind the Subaru. When Thibodeau slowly passed Besore's car, he observed Besore in the driver's seat and a black male, whom he later identified as Anderson, in the passenger seat. Thibodeau could not see what took place in the car but when he reversed direction, Besore and Anderson were still in Besore's car.

As Thibodeau was driving by Besore and Anderson, Kelly remained parked behind the Subaru and continued to listen to and record the transmissions received from Besore's electronic transmitting device. As he did this, Kelly also observed Besore's vehicle. He soon saw Anderson exit Besore's car and enter the

-4-

Subaru parked directly behind Besore's vehicle.  Besore then drove away, and Kelly ended his surveillance.  Kelly, however, retained possession of the tape used to record the transmissions from Besore's electronic transmitting device.  At some point subsequent, Kelly also made a copy of the tape.

After the controlled purchase was completed, Thibodeau headed toward where Besore had agreed to meet him.  Besore made a U-turn and followed Thibodeau, who kept Besore's car in sight until the two met a few minutes later.  At the meeting place, Besore exited his vehicle and gave Thibodeau a plastic bag filled with a certain substance.  Thibodeau then conducted the same search of Besore that he had carried out prior to the controlled purchase. No contraband or cash was found on Besore.

Thibodeau then conducted a field test on the substance in the plastic bag.  The field test came back positive for cocaine base and appeared to be in crack form.[1]  Thibodeau put the substance in an evidence envelope marked 159263, which he took to the DEA office and locked in the safe.  Following standard procedure, he then mailed the drugs in a bag with his initials to the DEA laboratory in New York to validate the identity of the substance, as well as its weight and purity.  Brian O'Rourke

_____

[1]  In several previous cases, we have noted that crack cocaine is merely one form of cocaine base.  See, e.g., United States v. Robinson, 144 F.3d 104, 107-09 (1st Cir. 1998); United States v. López-Gil, 965 F.2d 1124, 1134 (1st Cir. 1992) (opinion on panel rehearing).

("O'Rourke"), a DEA forensic chemist, tested the substance given by Besore to Thibodeau.  After testing, O'Rourke confirmed that the substance was cocaine base and determined its net weight to be 6.1 grams.

## B. The trial

On October 23, 2003, the grand jury returned its indictment against Anderson.  On April 7, 2004, a trial commenced in the district court.  For the purposes of this appeal, there were a number of key flashpoints during the trial.  We relate them here in turn.

### 1. The transcript

The day before trial, on April 6, 2004, the government filed a motion in limine requesting that the district court rule on whether the jury would be allowed to view a transcript of the recording containing the transmissions from the electronic transmitting device worn by Besore.  The recording was a copy made from the original.  The government argued that it would be permissible for the transcript to be used as an aid to the jury while the actual tape was being played.  The defense argued that the transcription was inaccurate, that it was not notarized, that the date was incorrect, and that there was no indication on the transcript as to who prepared it.

Having listened to the tape, the court asked the defense to identify any inaccuracies in the transcript.  The defense merely

responded that words were missing, the conversation did not flow, and parts of the tape were unintelligible. Noting that the defense had not identified specific inaccuracies in the transcript, the court ruled as follows:

> We all know that it's the tape itself that -- that the jury should be directing themselves to in terms of what should guide their deliberations. The transcript is merely an aid.
>
> To the extent that the defense has an alternative transcript, I will provide that to the jury at the same time and inform them that they can use either one, if they wish, for an aid, whichever helps them the best.
>
> Based on my review of the tape compared to the transcript, I'm going to permit the transcript provided by the government to go to the jury. I am going to give them the standard instruction, however, with regard to the use of the transcripts.

At trial, the defense argued that the transcript had not been authenticated. The court said that it assumed that the transcript would be authenticated by whomever prepared it. However, the individual who actually transcribed the tape and made the transcript was the prosecutor, who would not be able to take the stand as he was representing the government at trial. The government therefore took the position that the transcript could be authenticated by having the agent who made the recording, Kelly, compare the contents of the tape with the transcript to determine that the transcript accurately reflected the contents of the tape.

-7-

The defense also argued that since the conversations documented in the transcript were hearsay, the testimony of Besore, who actually took part in the conversations, was required to properly authenticate the transcript. However, the defense conceded that it would no longer have any hearsay objections to the transcript if the defendant's voice could be identified on the tape. The district court then informed the parties that it would wait to rule on whether the transcript could be properly authenticated until after Kelly took the stand.

On direct examination, Kelly testified that his primary role was to record any and all conversations relating to the electronic transmitter worn by Besore. He testified that he was able to hear what was being transmitted from Besore's electronic transmitting device at the same time that it was being recorded. Kelly also said that he could identify the defendant's voice on the tape. Finally, Kelly testified that he compared the tape to a transcript that the prosecutor's office had given him and concluded that the transcript accurately reflected the conversation.

The defense objected, disputing the foundation for Kelly's ability to recognize the defendant's voice on the tape. This objection, however, was overruled, and the transcript was admitted into evidence.

The government then moved to play the tape and give the jury the transcript as an aid in listening. The defense once again

objected but was overruled, and the transcript was distributed. The court told the jury:

> You are going to be given a transcript of certain tape recordings that are going to be played for you. I want to caution you -- this is important -- that the transcript is being given to assist you in listening to the tape. The tape, not the transcript, is the evidence in this case, and any difference that you see between the transcript and the tape must be resolved in favor of what you hear on the recording.
>
> Let me repeat that so that you're clear. The tape recording is the evidence. So if you hear -- let me just make something up -- brown, the color brown on the tape, and the transcript says green, the tape -- it's what you hear on the tape that governs and you are to disregard . . . what you see on the transcript if you see it's different. Obviously, if it's the same, it makes no difference. The transcript is merely to assist you, but it's the tape recording that governs. I guess I've said that three different ways, three different times, so I think it's probably pretty clear.

There was no objection to the instruction. The tape was then played for the jury.[2] However, it was garbled and not at all

---

[2] The tape that was played for the jury was a copy, not the original. The government had offered to play the original. However, the district court had previously ruled that if Besore did not appear to give testimony at the trial, the government would have to edit the tape and make another transcript to eliminate any hearsay. (The court was concerned in particular about any remarks Besore made while he was alone.) After Besore did fail to appear, the government realized that it would have to edit the tape. However, it discovered that the original could not be redacted. The government therefore decided to play a redacted version of the copy.

clear. After the tape ended, at the court's direction, the transcripts were collected. The court did not allow the transcripts to go into the jury room.

At the close of all the evidence, the court provided the following limiting instruction to the jury:

> During the course of this trial, you listened to a tape recording and were provided a transcript to assist you. Remember, the tape recording, and not the transcript, is the evidence in this case, and any difference between the transcript and the tape must be resolved in favor of what you heard on the recording.

The jury, after deliberating for nearly two hours, sent a note to the court requesting that it be provided with the original tape recording. The jury further requested that the court provide it with a copy of the transcript to help it in listening to the tape. When the court proposed to explain that the original was not available but to exercise its discretion to provide the transcript, the defense objected that the jury would rely too heavily on the transcript. Specifically, the defense argued:

> Our basis, Judge, is that at this point in time, where the jury is obviously having some difficulty in listening to the tape because of the quality of the tape, the transcript is really essentially going to be substituted for the tape itself. Just reading the transcript, we believe, at this time is going to leave an imprint upon the jurors' minds as to exactly what is said, and they are certainly the best arbiter as to what's said on that tape, Judge. So we would object to the transcript going in because at this point there's no difference

between the transcript and the tape as being
evidence.

The court directed counsel to United States v. Ademaj, 170 F.3d 58 (1st Cir. 1999), in which we held that a jury could be given access to an authenticated transcript subject to a limiting instruction. On the basis of this case, the court concluded that while it would not merely hand over the transcript to the jury, it was within its discretion to "permit the jury to listen -- to have the transcript while they listen to the tape recording that's been admitted already into evidence."  The court would also provide a limiting instruction.  When the defense challenged the authenticity of the transcript, the court replied, "I've ruled on that . . .  That's in."  After the parties were given time to read Ademaj, the defense agreed that the jury be returned to the courtroom to listen to the tape again with the transcript and another limiting instruction.

When the jury returned, the court announced that the original recording was not available but that the parties had agreed that the copy would be played while the jury followed with the transcript.  The court reminded the jury that

the transcript is only being provided to
assist you.  The tape, and not the transcript,
is the evidence in the case, and any
difference that you hear between the
transcript and the tape is to be resolved in
favor of what you hear on the recording,
period.

After the tape was played again, the transcripts were collected, and the jury returned to its deliberations.

-11-

## 2. Admission of Besore's prior conviction

During the cross-examination of Thibodeau, the defense, on two occasions, asked him about his relationship with Besore. On the first occasion, Thibodeau testified that he had worked with Besore on several occasions, that Besore was reliable, and that Besore was a trustworthy individual. When Thibodeau was asked if he was aware if Besore had a criminal record, he answered in the affirmative.[3] The following exchange then took place:

> Defense: Okay. Were you aware that he was convicted of --
>
> Prosecutor: Objection. This is Rule 609 information, and it's for cross-examination of the witness [i.e., Besore].
>
> ***
>
> Prosecutor: Your Honor, Rule 609 is one of the rules which you use to impeach a witness, but you have to impeach the witness. [i.e., Besore; emphasis added]. You can't impeach him through a third witness before -- there's no cross-examination of this witness, of Mr. Besore.
>
> ***
>
> Defense: It is allowed, Your Honor. Pursuant to Rule 404, a witness [i.e., Thibodeau] may testify with respect -- to give an opinion as to the truthfulness or untruthfulness character of an individual [i.e., Besore], and then he can give that opinion. And I'm also -- and I'm allowed to use extrinsic evidence in the form of convictions to -- to cross examine

---

[3] Besore had a prior felony conviction for tampering with a witness.

-12-

that witness [Thibodeau] with respect to that opinion.

Prosecutor: He [Thibodeau] hasn't given an opinion about the guy's [Besore's] truthfulness.

Defense: He just did.

Prosecutor: He did not. He said he was trustworthy.

The court: To him, that's all he [Thibodeau] said [i.e., that Besore was trustworthy]. I'm not going to allow the question under rule 403 and under rule 609.

Second, later in the cross-examination of Thibodeau, Thibodeau testified that he could not recall what Besore said when they met after the controlled purchase but that Besore turned over what he had bought. The defense then asked, "[a]nd you believed . . . that that was true . . . do you believe Besore and trust him?" Thibodeau replied, "Absolutely." Although acknowledging the court's earlier ruling, the defense once again argued that Besore's prior conviction should be admitted because "we should be able to show that as it relates to this officer's [Thibodeau's] credibility how credible this person is." The following exchange then ensued:

The court (clarifying): "You want to impeach this witness's [Thibodeau's] credibility because he believes somebody you say he shouldn't be believing?"

Defense: This officer is saying that Mr. Besore's believable. There is extrinsic evidence that we have with respect to convictions that would demonstrate that Mr. Besore is not believable.

-13-

The court: All right. Go ahead.

Prosecutor: Judge, it's improper impeachment of this witness [Thibodeau], plus the agent has already testified about the basis for -- the only thing that's changed since the last [ruling] is this agent's described what he observed during the transaction and said, when Besore got out of the car and handed him the drugs, he believed that he got these drugs during the transaction. His [Thibodeau's] testimony says, I don't remember what Besore told me.

The court: I'm not going to allow it -- same basis.

### 3. Chain of custody

Prior to the commencement of trial, the defense -- at the same time the government had made its motion in limine regarding the transcript -- orally moved in limine to exclude the drugs Thibodeau recovered from Besore, on the basis that the government would be unable to establish a clear chain of custody absent Besore's testimony. The court declined to rule on the defense's motion at that time, indicating that it was not yet certain that Besore was not going to testify at trial.

At trial, on the redirect examination of Thibodeau, the government sought to admit into evidence the drugs that were given to Thibodeau by Besore. The defense objected, claiming that the government had not established a clear chain of custody. The court overruled this objection and allowed the drugs to be admitted into evidence.

### 4. Missing witness instruction

On April 7, 2004, at the start of the trial, the government informed the defense and the court that, despite its attempts to subpoena Besore to testify, Besore was not present. Moreover, Besore never appeared during the remainder of the trial.

At the close of all the evidence, in a meeting in chambers, the defense requested that the court give the following "missing witness" instruction to the jury:

> If it is peculiarly within the power of the government to produce a witness who could give material testimony, or if a witness, because of his relationship to the government, would normally be expected to support the government's version of the events, the failure to call that witness may justify an inference that his testimony would in this instance be unfavorable to the government. You are not required to draw that inference, but you may do so. No such inference is justified if the witness is equally available to both parties, if the witness would normally not be expected to support the government's version of the events, or if the testimony would merely repeat other evidence.

The defense requested this instruction relying in part on United States v. Pérez, 299 F.3d 1 (1st Cir. 2002). The government filed a "Memorandum of Law Regarding Missing Witness Instruction" in which it set forth its opposition to the charge being given. The government's response included a copy of Besore's subpoena, his grand jury testimony, and the affidavit of Nancy Evans, a paralegal specialist for the government, describing communication with Besore about his duty to appear, Besore's statement to the government that

-15-

he feared his testimony would endanger his family, and information about his general inability to keep interview appointments.

Using the framework for "missing witness" instructions set out in Pérez and other cases,[4] the court ruled as follows:

> The witness here appears to be a, what I call, independent contractor, confidential informant. He worked when he wanted to work for the government, and at other times, God knows what he was doing, but he certainly wasn't a government agent, nor was he a government employee, nor was he a quasi-full-time government informant working undercover. And that sets a different relationship to the government than a police officer or DEA agent who fails to appear.
>
> Second, it's unclear to me that this fellow was favorably disposed to testify totally on behalf of the government . . . there are probably some issues he'd testify favorably and some issues he'd testify not favorably.
>
> And, clearly, the relationship he has with the government . . . doesn't, in my view, make him fully favorably disposed, nor do I find he's peculiarly available to the government as to be within their control, exclusive or otherwise. The defendant in this case had the same ability to seek out and subpoena this individual as anybody else; they did not . . . there certainly was no requirement that the government even put this individual on even if he was available, making the defendant's ability to subpoena him and put him on even more important.

---

[4] As we discuss in greater detail below, a defendant seeking a "missing witness" instruction must demonstrate that the uncalled witness is "favorably disposed" or "peculiarly available" to the government. Pérez, 299 F.3d at 3. If the defendant satisfies that threshold burden, the court must then "consider the explanation (if any) for the witness's absence and whether the witness, if called, would likely provide relevant, non-cumulative testimony." Id.

> I also note that . . . no subpoena was served by anyone in this case other than the government, and if he was such a key witness, the subpoena certainly would have been served by both sides. I'm going to deny the request for the missing witness instruction.

### C. Sentencing

At the conclusion of the two-day jury trial, Anderson was convicted. On July 27, 2004, the United States Probation Office completed Anderson's Presentence Report (PSR). The PSR identified the drug quantity as 6.1 grams of crack cocaine, which produced a base offense level of 26. However, the PSR also explained that Anderson stood convicted of a drug offense and had previously been convicted of drug offenses, as described in PSR ¶26 and ¶28: a 1994 Massachusetts conviction and a 2002 Massachusetts conviction. This made him a Career Offender. His total offense level, therefore, became 34.

Anderson was initially assessed six criminal history points, which placed him at a criminal history category (CHC) III. However, because he was classified as a Career Offender, his CHC was automatically increased to VI.

According to the PSR, the statutory term of imprisonment was at least five years and no more than 40, pursuant to 21 U.S.C. § 841(b)(1)(B). At a total offense level of 34 and CHC VI, Anderson's Guideline range was 262 to 327 months in prison.

Anderson raised a number of specific objections to the PSR. First, he contested the initial assignment of a base offense level of 26, noting that such an assignment was based on the fact that he had been convicted for possessing crack cocaine. Anderson pointed out that he was convicted for possessing not crack cocaine, but cocaine base. Second, Anderson objected to the conclusion reached by the PSR that he qualified as a Career Offender, on the grounds that the PSR ¶26 and ¶28 convictions did not qualify. Finally, he disputed being placed preliminarily in CHC III as a result of the six criminal history points he was assessed.

A presentence conference took place on December 7, 2004. At this conference, Anderson continued to press his objection to the base offense level of 26, disputing any references to crack cocaine in the PSR. He again noted that the substance found at trial was cocaine base, not crack cocaine. Then, he argued that since the substance found was cocaine base, and because "there is nothing chemically different from [i.e., between] cocaine base and cocaine [powder]," he should be sentenced on the basis of 6.1 grams of _cocaine_ [powder], which would produce a base offense level of 12.[5] He also reiterated his objection to the PSR's conclusion that he be classified as a Career Offender.

---

[5] Anderson's statement that "there is nothing chemically different from [i.e., between] cocaine base and cocaine [powder]" is factually incorrect. The two substances _are_ chemically different. See United States v. Isler, 429 F.3d 19, 29 (1st Cir. 2005); Robinson, 144 F.3d at 108.

The district court ordered both parties to submit sentencing memoranda indicating objections and the grounds for the objections with supporting case law. These sentencing memoranda, once submitted, focused primarily on two issues. First, the parties discussed whether Anderson was indeed a Career Offender; second, they discussed Anderson's argument relating to the distinctions between crack cocaine, cocaine base, and cocaine powder.

Regarding the second issue,[6] Anderson argued that the government had failed to make any showing that the substance recovered by Thibodeau from Besore was crack cocaine. He also reiterated his argument that there is no chemical distinction between cocaine base and cocaine powder. Relying on United States v. Brisbane, 367 F.3d 910 (D.C. Cir. 2004), he then pointed out that an ambiguity existed in the governing statute, 21 U.S.C. § 841. As a result, he argued that the district court, following the example of the D.C. Circuit, should apply the rule of lenity[7] and sentence him under the statute governing the applicable amount of cocaine powder, 21 U.S.C. § 841(b)(1)(C). In other words, he

---

[6] As we discuss below, the "Career Offender" issue was resolved in Anderson's favor, and it is not in dispute in this appeal. Therefore, we do not discuss it further.

[7] We have held that "[t]he rule of lenity requires that ambiguities in the scope of a criminal statute must be resolved in favor of the criminal defendant." United States v. Luna-Díaz, 222 F.3d 1, 3 n.2 (1st Cir. 2000).

argued that rather than face a five-year mandatory minimum under 21 U.S.C. § 841(b)(1)(B), he should face only the default maximum of 20 years under 21 U.S.C. § 841(b)(1)(C).

In response, the government first pointed out that the district court was not bound by the D.C. Circuit's opinion in Brisbane. In addition, the government contended that this Court's opinion in United States v. López-Gil, 965 F.2d 1124 (1st Cir. 1992) (opinion on panel rehearing), was more on point and controlling on the issue.

On April 27, 2005, the district court conducted a sentencing hearing. At the outset, the government resolved the issue of whether Anderson was a Career Offender, conceding that he did not have the two predicate offenses required under U.S.S.G. § 4B1.1(a) and that he should have been placed in CHC III. With respect to the appropriate classification of the drugs recovered from Besore following the controlled purchase (crack cocaine, cocaine base, or cocaine powder), the court held that the PSR correctly concluded that the drugs were crack cocaine. Summing up and noting that Anderson was "accountable for the distribution of 6.1 grams of cocaine base, crack," that his base offense level was 26, and that he was placed in CHC III, the court determined that Anderson had a Guideline range of 78 to 97 months.

The court then sentenced Anderson to 78 months of imprisonment, five years of supervised release, and a $100

assessment.  A timely notice of appeal was filed, objecting to both the conviction and the sentence.

## II.  Discussion

### A. The transcript issue

We review the district court's decision to allow the use of the transcript for abuse of discretion.  United States v. Panzardi-Lespier, 918 F.2d 313, 318 (1st Cir. 1990); United States v. Campbell, 874 F.2d 838, 849 (1st Cir. 1989).

The appellant makes two separate arguments about the transcript used by the jury at trial.  His first argument is that the individual who prepared the transcript did not take the stand to authenticate it.  In this case, the individual who actually transcribed the tape and made the transcript was the prosecutor, who was not able to take the stand as he was representing the government at trial.  The government therefore took the position that the transcript could be authenticated by having the agent who made the recording, Kelly, compare the contents of the tape with the transcript to determine that the transcript accurately reflected the contents of the tape.  This was deemed sufficient by the district court to authenticate the transcript.  The appellant, however, contends this decision was erroneous.

We, however, discern no problem with Kelly authenticating the transcript.  In United States v. Carbone, 798 F.2d 21 (1st Cir. 1986), we wrote that "when transcripts are offered for use, either

-21-

as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence, i.e., by testimony as to how they were prepared, the sources used, and the qualifications of the person who prepared them." Id. at 26. In this case, the government could not provide this testimony because the individual who could best offer such information was prohibited from providing it. That, however, did not mean that the transcript could not be authenticated. In other cases, we have approved the use of transcripts that were authenticated by individuals other than the transcribers. For example, in Ademaj, 170 F.3d at 65 n.8, we approved the authentication of transcripts where the transcripts were authenticated by an individual other than the transcriber. In that case, a cooperating witness listened to the tapes of conversations in Greek and orally translated them into English. A DEA agent then reduced the cooperating witness's oral translations to writing. At trial, a Greek-language interpreter testified that she had reviewed and compared these tape-recorded conversations with the transcripts prepared by the cooperating witness and the DEA agent and found the transcripts to be accurate.

The instant case presents a similar situation. Kelly -- like the Greek-language interpreter in Ademaj -- compared the transcript to the tape recording and testified that the transcript fairly and accurately represented the conversation on the tape. In fact, we think that Kelly was in an even better position than the

interpreter in Ademaj to authenticate the transcript, as he himself had listened to the conversation between Anderson and Besore while monitoring the controlled purchase.

We also wish to point out that if the appellant was so concerned about the authenticity of the government's transcript, he could have submitted his own. The district court specifically invited Anderson to submit his own transcript. Anderson, however, failed to do so. In a number of cases, we have rejected a party's claim about the admissibility of a transcript when the district court had invited the party to submit a transcript of its own, and the party declined to take up this invitation. See, e.g., Ademaj, 170 F.3d at 65; United States v. Pion, 25 F.3d 18, 21, 26-27 (1st Cir. 1994). This case is no different.

Anderson's second argument relating to the transcript is that because of the poor quality of the tape, the transcript -- which was to serve merely as an aid in interpreting the real evidence, the tape -- became the actual evidence that the jury relied upon in handing down its conviction. We encountered a nearly identical argument in United States v. DeLeón, 187 F.3d 60, 66 n.3 (1st Cir. 1999). However, as in that case, we reject the appellant's claim.

First, we note that the district court reminded the jury at least three separate times that the tape, not the transcript, constituted the evidence in this case and that any discrepancies

between the two were to be resolved in favor of the tape.  In DeLeón, we found such a limiting instruction to be an important factor in rejecting the appellant's argument.  In this case, we think that such an instruction -- especially given the fact that it had been repeated several times by the district judge -- ensured that the jury did not rely on the transcript to convict the appellant.

In United States v. Robinson, 707 F.2d 872 (6th Cir. 1983), the Sixth Circuit provided relief to an appellant making an argument similar to the one made here by Anderson.  In that case, the district court had likewise provided a limiting instruction, telling the jury to only consider the tape, not the transcript, as evidence.  The Sixth Circuit, however, held the following:

> This Court is keenly aware that there is a distinct difference between evidence and an aid used to assist the jury in understanding the evidence.  However, the distinction becomes nebulous where, as here, the evidence is unintelligible.  The practical effect of using an aid to comprehend unintelligible matter is that the aid becomes the evidence. . . .  While [the district court provided] an adequate [limiting] instruction, its directives are only viable when the tape is clear enough for a juror to detect that the tape is at variance with the transcript.  But where, as here, the tapes are partially inaudible, the juror is precluded from making an intelligent comparison.  Hence, the likely result is that the transcript becomes the evidence.

Id. at 878. We, however, believe that this case is different from Robinson in one key respect.  In Robinson, the prosecution

-24-

submitted recordings that were in many portions so greatly inaudible as to render any attempt at transcription speculative. Nevertheless, the prosecution provided the jury with what it purported to be transcripts of the recorded conversations. In this case, however, the government never attempted to interpret portions of the tape that were unintelligible. Rather, the transcript specifically noted those portions of the tape that were unclear. Thus, the jury in this case was not able to turn to the transcripts to comprehend the unintelligible portions of the conversation, as the transcript likewise provided no assistance. Accordingly, we find Robinson to be inapposite here.

Second, even if there was error in the use of the transcript, we believe that it was harmless. See United States v. Andiarena, 823 F.2d 673, 677 n.5 (1st Cir. 1987). The tape and the accompanying transcript constituted only a small part of the government's case. There was other, overwhelming circumstantial evidence that Anderson had engaged in the drug transaction in question. Thibodeau and Kelly, two members of the surveillance team that observed the transaction, testified in detail about the following: 1) the constant electronic monitoring of Besore's conversations; 2) the constant visual surveillance of Besore's car by team members; and 3) the thorough searches of both Besore and his vehicle before and after the controlled purchase. Thus, even

without the tape and the transcript, there was strong circumstantial evidence of guilt.

## B. Admission of Besore's prior conviction

The appellant's next argument is that the district court erred by not allowing him to introduce evidence of Besore's felony conviction. A challenge to a limitation on the scope of cross-examination is reviewed for abuse of discretion. See United States v. Kaplan, 832 F.2d 676, 684 (1st Cir. 1987).

For a number of reasons, we reject Anderson's argument. Before we discuss our reasoning, we wish to point out that the parties, in their briefs, disagree about exactly whose credibility would be attacked if the appellant were permitted to introduce evidence of Besore's felony conviction -- Besore's or Thibodeau's. Because the appellant's claim fails in either case, we address both scenarios.

We begin with the scenario in which it is Besore's credibility that is being attacked. Fed. R. Evid. 608 reads as follows:

> (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of a crime as provided in rule 609, may not be provided by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608. As support for his position that the prior conviction evidence should have been permitted, the appellant cites to Fed. R. Evid. 608(b)(2), i.e., the provision that states that extrinsic evidence, such as evidence of a prior conviction, may be inquired into on cross-examination "concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." See Fed. R. Evid. 608(b)(2). The appellant argues that because Thibodeau testified about Besore's trustworthiness, the appellant should have been allowed to present Thibodeau with evidence of Besore's prior conviction, a conviction that is probative of Besore's character for untruthfulness.

Anderson's argument, however, contains a fundamental weakness -- namely, the fact that Besore cannot be considered a witness. As the government correctly points out, Besore never testified. Rule 608(b)(2) makes clear that evidence of a prior

conviction may be inquired into on cross-examination "concerning the character for truthfulness or untruthfulness <u>of another witness</u> as to which character the witness being cross-examined has testified" (emphasis added). Here, however, Besore was not a witness, so proof of his prior conviction is not permitted.

The appellant counters that since Thibodeau was allowed to discuss Besore and his positive interactions with Besore under Rule 608(a), it is only fair that he (the appellant) be allowed to rebut that testimony and provide proof of Besore's prior conviction. This argument fails. Rule 608(a), like Rule 608(b), states that "the credibility <u>of a witness</u> may be attacked or supported . . . ." In discussing his view that Besore was trustworthy, Thibodeau was not attacking or supporting the credibility <u>of a witness</u>, because, as discussed above, Besore did not testify.

Rule 608(b) forecloses the appellant from arguing that it was really Thibodeau, the witness, whose credibility was being attacked, and that he could get into evidence Besore's felony conviction through the back door when the front door was barred. Rule 608(b) refers to "specific instances of the conduct <u>of a witness</u>" as appropriate for inquiry through cross-examination. As discussed above, Besore was not a witness. Therefore, the district court was correct in finding that specific instances of <u>his</u> conduct were not admissible during Thibodeau's cross-examination.

## C. Chain of custody

Anderson's third argument is that there is a gap in the chain of custody for the drugs that the government sought to admit into evidence. Anderson notes that although Thibodeau testified that he received the drugs from Besore, Besore did not take the stand to testify that he in fact received the drugs from Anderson. Thus, it was possible, suggests Anderson, that Besore hid drugs on his person or in his vehicle in an effort to frame Anderson. He argues that without Besore's testimony, there was no way for the district court to determine that Besore had not exchanged, tampered with, or contaminated the evidence since the meeting with Anderson in Besore's car. To Anderson, then, Besore represents a gap in the government's chain of custody. In light of this gap, Anderson contends that the district court erred in admitting the drugs.

We review the district court's chain of custody determination for abuse of discretion. See United States v. Cartagena-Carrasquillo, 70 F.3d 706, 715 (1st Cir. 1995). In United States v. Abreu, 952 F.2d 1458 (1st Cir. 1992), we set forth the standards to be applied by the district court in such cases:

> In determining whether the evidence is admissible, the trial court must conclude that it was reasonably probable that the evidence had not been altered since the occurrence of the crime. The evidence in question is properly admitted if it is readily identifiable by a unique feature or other identifying mark. On the other hand, if the offered evidence is of the type that is not readily identifiable or is susceptible to

> alteration, a testimonial tracing of the chain
> of custody is necessary. The purpose of
> testimonial tracing is to render it improbable
> that the original item either has been
> exchanged with another or has been tampered
> with or contaminated.

Id. at 1467 (internal quotation marks and citations omitted).  We also noted that "[e]ven though there may be gaps in the chain of custody for a certain piece of evidence, such gaps factor into the weight given to the evidence rather than its admissibility."  Id.

In this case, because the drugs that the government sought to admit were not readily identifiable in any way, a testimonial tracing of the chain of custody was required.  At trial, the government endeavored to provide the necessary tracing.  Thibodeau testified that after the controlled purchase, he met Besore at a pre-arranged spot, where Besore gave him the drugs he had purchased from Anderson.  Thibodeau then conducted a field test that proved positive for cocaine.  Thibodeau then put the drugs in an evidence envelope, marked it with an identifying number that he recited at trial, took the envelope to the DEA office, and locked it in the safe.  Thereafter, following standard procedure, he mailed the drugs in a bag that contained his initials to the DEA laboratory in New York.  At that point, O'Rourke, the forensic chemist who analyzed the drugs, forged the next custody link.  He identified the bag by his initials, by the date he received it, and by the date he sealed it again.  O'Rourke also established that

until the bag was returned to Maine for the trial, it remained in the custody of the DEA laboratory in New York.

Anderson contests the strength of the first link in this chain -- namely, he argues that there is no proof that the drugs Besore gave to Thibodeau were the same ones Besore had purchased minutes earlier from Anderson. However, we think that the district court was correct in finding that the chain of custody provided by the government was sufficient for admitting the drugs into evidence. We have held that "the prosecution's chain-of-custody evidence must be adequate -- not infallible." United States v. Ladd, 885 F.2d 954, 957 (1st Cir. 1989). In this case, there was sufficient evidence for the district court to find that the drugs the government sought to admit were indeed the ones that Anderson had given to Besore. Both Besore and his vehicle were searched extensively prior to the controlled purchase. Moreover, after the controlled purchase was completed and Besore left to meet Thibodeau at the pre-arranged meeting place, Besore remained in Thibodeau's sight during the drive. Thus, there was no way that Besore could possibly have contaminated or exchanged the evidence. Thibodeau's testimony was sufficient to establish that the drugs were what the government claimed them to be. See Fed. R. Evid. 901(a) (noting that for authentication purposes, sufficient evidence is required "to support a finding that the matter in question is what its proponent claims"). Moreover, as the appellant himself points out,

even if information about the origin of the drugs provided to Thibodeau did represent a gap in the chain of custody, such a gap factored into the weight given to the evidence rather than its admissibility. See Abreu, 952 F.2d at 1467. Accordingly, we hold that the district court did not abuse its discretion in admitting the drugs into evidence.

### D. Missing witness instruction

Anderson's fourth argument is that the district court erred in refusing to issue to the jury the "missing witness" instruction he desired. We review the district court's decision for abuse of discretion. See Pérez, 299 F.3d at 3; United States v. DeLuca, 137 F.3d 24, 38 (1st Cir. 1998).

In Pérez, we set forth the requirements for a "missing witness" instruction:

> [A]s a preliminary requirement to the consideration of a missing witness instruction, a criminal defendant must demonstrate that the uncalled witness is either "favorably disposed" to testify on behalf of the government by virtue of status or relationship or "peculiarly available" to the government. United States v. DeLuca, 137 F.3d 24, 38 (1st Cir. 1998). Once past that point, the court must consider the explanation (if any) for the witness's absence and whether the witness, if called, would be likely to provide relevant, non-cumulative testimony. United States v. Lewis, 40 F.3d 1325, 1336 (1st Cir. 1994).

Pérez, 299 F.3d at 3. In this case, Anderson failed to satisfy his threshold burden. He did not show that Besore was "favorably

disposed" or "peculiarly available" to the government. With regard to demonstrating that Besore was "favorably disposed" to testify on behalf of the government, the district court noted that Besore was not a government agent who was in the government's employ. Instead, he was a private citizen, who, in the court's view, was an "independent contractor." Although Besore had cooperated in exchange for Thibodeau's recommendation that Besore's criminal speeding charges be dismissed, we have made clear that the mere fact of cooperation does not make a witness "favorably disposed" to the government. See DeLuca, 137 F.3d at 38. Here, moreover, it was far from clear to the court that Besore "was favorably disposed to testify totally on behalf of the government." Instead, as the court explained, "there are probably some issues [on which] he'd testify favorably and some issues [on which] he'd testify not favorably." Thus, the district court was justified in finding that Besore was not "favorably disposed" to the government.

Nor did Anderson demonstrate that Besore was "peculiarly available" to the government. The government explained in detail its efforts to secure Besore's presence at trial and how it had failed. See United States v. Ariza-Ibarra, 651 F.2d 2, 16 (1st Cir. 1981). Not only had the government served Besore with a subpoena to appear, but the government's paralegal specialist had reminded him of that obligation. The paralegal specialist's affidavit described her communications with Besore and his reply

that he feared his testimony would endanger his family. Notwithstanding these contacts, by the time of trial, it appeared the government did not even know where Besore could be found. That the government could not get Besore to appear, despite such efforts, demonstrates conclusively that he was not available to the government, much less "peculiarly available."

Moreover, Anderson had the same ability as the government to seek a subpoena to require Besore's appearance at trial. Anderson clearly knew Besore might be a witness and indeed had reason to believe he might be important to his defense. As the defense conceded, however, it never tried to subpoena Besore. Neither did Anderson seek a continuance to press his search for Besore. See id. at 12. Instead, he simply requested the "missing witness" instruction. See id. (pointing out that absent some effort to secure witness's appearance, request for "missing witness" instruction "indicates that defense counsel is more interested in exploiting the witness's absence than seeing him produced" (quoting United States v. Díaz, 535 F.2d 130, 135 n.5 (1st Cir. 1976)). The fact that Anderson was able to subpoena Besore yet failed to do so gives us additional reason to believe that the district court was correct in finding that Besore was not "peculiarly available" to the government.

With Anderson's failure to satisfy his threshold burden for the issuance of the "missing witness" instruction, it is

irrelevant whether Besore would have provided relevant, non-cumulative information. Anderson goes on at length about how Besore, had he testified, would have provided important information about the conversation that he had with Anderson during the controlled purchase, about whether the drug evidence had been contaminated or exchanged, and about any motive that he had to frame Anderson. That Besore could have provided such information, however, does not matter, since Anderson was unable to show during the preliminary inquiry that Besore was "favorably disposed" or "peculiarly available" to the government.

Anderson likewise ignores the importance of this threshold inquiry in his attempt to distinguish Pérez -- a case in which we upheld the district court's decision to deny a defendant's request for a "missing witness" instruction. In Pérez, a confidential government informant who took part in a drug deal with the defendant did not testify at the defendant's trial. To Anderson, our decision to affirm the district court's denial of the "missing witness" instruction in that case was based on the fact that the government possessed a qualified privilege to withhold the identity of confidential informants. Anderson argues that this case is different, as the government disclosed the identity of Besore prior to trial. He contends that the government possesses no "qualified privilege" in this case, and the rationale undergirding the Pérez decision is inapplicable here.

Anderson's reasoning, however, is flawed. Although we did note in _Pérez_ that the government possessed a qualified privilege with respect to disclosing the identity of its confidential informants, it was not the government's interest in confidentiality that led us to uphold the district court's denial of the "missing witness" instruction. Rather, it was the fact that the defendant in _Pérez_ had made no attempt to force the government to disclose the confidential informant's identity prior to trial, despite being able to do so. We wrote that "[i]nstead . . . he waited until both sides had rested and then, despite having made no effort to obtain the informant's identity in the usual manner, implored the court to instruct the jurors that they could draw an adverse inference from the government's failure to offer the [confidential informant's] testimony." _Pérez_, 299 F.3d at 4.

Thus, rather than presenting a set of facts different from this case, _Pérez_ is actually quite similar. That the defendant in _Pérez_ could have taken steps to obtain the informant's identity yet chose not to do so meant that he did not satisfy his burden in demonstrating that the missing witness was "peculiarly available" to the government. The same is true in this case. As we have discussed, Anderson could have issued a subpoena to Besore but elected not to do so. The result of such inaction on Anderson's part is that he failed to satisfy his burden in demonstrating that Besore was "peculiarly available" to the

government.  As the government correctly points out, then, the critical issue here is not whether the government possesses a qualified privilege as to its confidential informants, but instead whether the witness is "favorably disposed" or "peculiarly available" to the government.  Because Anderson failed to satisfy his burden as to this threshold showing, we hold that the district court did not abuse its discretion in denying the sought-after "missing witness" instruction.

## E. Sentencing

### 1.

Anderson next contests two aspects of his sentencing. First, he argues that the district court erred in computing his sentence under the Guidelines.  The district court found that Anderson was responsible for the distribution of 6.1 grams of crack cocaine.  Accordingly, the court, taking into account that Anderson was placed in CHC III, found that Anderson's Guidelines range was 78-97 months.  Anderson, however, claims that the district court erred in its finding that he had distributed crack cocaine.  He contends that the trial had only established that he was responsible for distributing cocaine base, not crack cocaine in particular.  This distinction is important because we have noted that "[f]orms of cocaine base other than crack are treated as cocaine hydrochloride [cocaine powder] for purposes of calculating the GSR [Guidelines sentencing range]." United States v. Robinson,

-37-

144 F.3d 104, 108 (1st Cir. 1998) (citing U.S.S.G. App. C, Amend. 487). Anderson therefore states that his base offense level should have been calculated based on 6.1 grams of cocaine hydrochloride (cocaine powder). The Guidelines establish a base offense level of 12 for a quantity involving less than 25 grams of cocaine hydrochloride (cocaine powder). See U.S.S.G. §2D1.1(c)(14) (2003). At a total offense level of 12 and a criminal history category of III, Anderson contends that his GSR should have been 15-21 months.

We have held that "[w]hether a particular substance is crack or cocaine for purposes of the sentencing guidelines is a question of fact to be determined by the court." Robinson, 144 F.3d at 109. The sentencing court's fact-finding must be accepted unless it is clearly erroneous. See United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992). When the nature of an illicit substance is material at sentencing, the government has the burden to prove the substance's identity by a preponderance of the evidence. See United States v. Legarda, 17 F.3d 496, 499 (1st Cir. 1994).

We believe that the government has satisfied its burden. At trial, Thibodeau testified that minutes after the conclusion of the controlled purchase, Besore turned over to him the substance he had bought from Anderson. Without objection, Thibodeau identified the substance as "rock cocaine or crack cocaine in what we call Dominican-tie plastic bags" and explained that the bags were cut

and twisted "to keep the rock clean." See Robinson, 144 F.3d at 108 (noting that crack is "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form") (quoting U.S.S.G. § 2D1.1(c)(n.(D))). Twice more in his testimony, Thibodeau referred to the drug Besore gave him as the rock form of cocaine base.

Similarly, the government's expert, the DEA chemist Brian O'Rourke, testified that he had received from Maine 16 small bags each of which contained a yellowish-white, rock-like substance, and that the net weight was 6.1 grams. Describing the procedure he followed, O'Rourke explained that he ground the rocks into powder so that they could be evaluated through three separate tests. Based on his professional experience and the test results, without objection, O'Rourke identified the drugs as cocaine base. Cross-examination confirmed that when the drugs arrived they were in the rock form that is characteristic of crack cocaine. See id.

Anderson challenges this testimony in two ways. First, he claims that Thibodeau lacked the training and experience needed to identify the drug as crack cocaine. He points out that Thibodeau testified that he had been working as a HIDA agent for only 18 months. Although this is true, Thibodeau had also worked as a policeman for eight years. Both in his work as a police officer and as a HIDA agent, he had participated in hundreds of

-39-

controlled purchases.  See id. (noting that "we often have permitted law enforcement officers, not formally trained as 'experts,' to furnish opinions based on their real-world experience").  Moreover, we note that at trial, Anderson never disputed Thibodeau's qualifications in making a visual identification of the drug or in performing the field test that proved positive for crack cocaine.  See United States v. Díaz, 300 F.3d 66, 74 (1st Cir. 2002) (noting that "litigants must raise a timely objection . . . to preserve a challenge on appeal").

To drive home his point that Thibodeau lacked the exprience needed to identify the drugs as crack cocaine, Anderson points out how Thibodeau seemed to confuse the terms "crack cocaine" and "cocaine base" and use them interchangeably in his testimony as though there was no difference between the two.  For example, Anderson points to the following exchange:

> Q:  Okay.  Did -- based on your conversation with Mr. Besore, what kind of drugs did you think you might be buying that day?
>
> Thibodeau:  Crack cocaine.
>
> Q:  All right.  Cocaine base?
>
> Thibodeau:  Correct.

We, however, see no confusion on Thibodeau's part in this exchange.  Rather, we think that he is demonstrating his knowledge of cocaine base and its different forms, since, as we noted above, crack cocaine is a kind of cocaine base.

Anderson's second challenge is based on the fact that the government did not elicit any testimony from O'Rourke pertaining to the different forms of cocaine base or whether the cocaine base he tested was the type of cocaine base referred to as crack. This argument, however, is unavailing, because even though O'Rourke did not explicitly identify the drugs he tested as crack cocaine, O'Rourke mentioned several times during his testimony that he had tested the rock form of cocaine base. As we noted in Robinson, cocaine base in a rock form is usually considered to be crack cocaine. See Robinson, 144 F.3d at 108.

Moreover, we have encountered a nearly identical argument in previous cases. See, e.g., United States v. Ferreras, 192 F.3d 5 (1st Cir. 1999); United States v. Martínez, 144 F.3d 189 (1st Cir. 1998); Robinson, 144 F.3d at 104. For example, in Ferreras, the defendant argued that the government had failed to prove that the cocaine base in his possession was in fact crack cocaine. In response, we wrote:

> [O]nce the government laid a proper foundation by introducing a chemical analysis proving that, chemically, the contraband was cocaine base, no further scientific evidence was needed. Instead, the government could bridge the evidentiary gap between cocaine base and crack cocaine by presenting lay opinion evidence (or an opinion proffered by an expert who possessed practical as opposed to academic credentials) from a reliable witness who possesses specialized knowledge (gained by experience in dealing with crack or familiarity with its appearance and texture).

-41-

192 F.3d at 11 (internal citations and quotation marks omitted). In this case, the government followed this framework to the letter. As we discussed above, the government, through O'Rourke, introduced chemical test results demonstrating that the drugs recovered from Besore were indeed cocaine base. This, combined with Thibodeau's testimony, was sufficient for the district court to find that Anderson had distributed crack cocaine. Therefore, we hold that the district court did not err in finding that Anderson was responsible for the distribution of 6.1 grams of crack cocaine and computing his sentence accordingly under the Guidelines.

**2.**

Anderson's second argument regarding his sentence is that the district court violated his constitutional rights in determining that a five-year mandatory minimum sentence applied to him pursuant to 21 U.S.C. § 841(b)(1)(B)(iii). The constitutionality of a sentence is a question of law subject to de novo review. See Mistretta v. United States, 488 U.S. 361 (1989).

Anderson's entire argument is based on a May 2004 case decided by the D.C. Circuit, United States v. Brisbane, 367 F.3d 910 (D.C. Cir. 2004). Brisbane related to the proper manner of interpreting the sentencing scheme in 21 U.S.C. §§ 841(b)(1)(A), (B), and (C). That scheme is considered to establish two tiers of penalties for offenses involving cocaine, with higher penalties for crack cocaine and other forms of cocaine base and lesser penalties

for cocaine powder.  See 21 U.S.C. §§ 841(b)(1)(A), (B), and (C); see also United States v. Richardson, 225 F.3d 46, 49 (1st Cir. 2000); Robinson, 144 F.3d at 107.

For example, § 841(b)(1)(B)(iii) provides for a mandatory minimum five-year sentence for an offense involving "5 grams or more of a mixture or substance . . . which contains cocaine base." 21 U.S.C. § 841(b)(1)(B)(iii).  Section 841(b)(1)(B)(ii)(II), by contrast, provides for a mandatory minimum five-year sentence for offenses involving "500 grams or more of a mixture or substance containing a detectable amount of cocaine, its salts, optical and geometric isomers, and salts of isomers."  21 U.S.C. § 841(b)(1) (B)(ii)(II).  Importantly, no mandatory minimum sentence applies to an amount of cocaine base that is less than 5 grams or an amount of cocaine that is less than 500 grams.  See 21 U.S.C. § 841(b)(1)(C).

In Brisbane, the D.C. Circuit ruled that such a sentencing scheme was ambiguous.  See 367 F.3d at 912.  Anderson notes that the ambiguity lies in the fact that references to "cocaine base" and "cocaine" in § 841(b)(1) involve the same substance.  He leads us to this conclusion by pointing out that cocaine in its naturally occurring form is a base.  Therefore, the phrase "cocaine base," in scientific terms, is redundant.  In other words, to a scientist, "cocaine" and "cocaine base" are synonymous; they both refer to a substance with the same chemical formula.

According to Anderson, to understand the statutory terms in this way creates an ambiguity in the statute. For example, if one is to read the mention of "cocaine" in § 841(b)(1)(B)(ii)(II) as referring to "cocaine base," then the statute would be read in such a way that a mandatory minimum five-year sentence applies for an offense involving 500 grams or more of cocaine base. This, however, is contrary to the scheme set forth in § 841(b)(1)(B)(iii), which states that a mandatory minimum five-year sentence applies for an offense involving five grams or more of cocaine base. See United States v. Isler, 429 F.3d 19, 28-29 (1st Cir. 2005).

As a result of such an ambiguity, the D.C. Circuit in Brisbane decided to apply the rule of lenity and ordered the lower court to sentence the defendant in that case under the more forgiving penalty provisions relating to cocaine powder (discussed in 21 U.S.C. § 841(b)(1)(B)(ii)(II) and 21 U.S.C. § 841(b)(1)(C)) and not cocaine base (discussed in 21 U.S.C. § 841(b)(1)(B)(iii)). In this case, Anderson urges us to follow the lead of the D.C. Circuit and find an ambiguity in the statute. He asks us to likewise apply the rule of lenity and sentence him on the basis of an offense involving cocaine powder. If we were to follow such an approach, no mandatory minimum sentence would apply to Anderson, since the statute states that no mandatory minimum applies for an amount of cocaine powder that is less than 500 grams. Anderson

-44-

would only face the default maximum of 20 years under 21 U.S.C. § 841(b)(1)(C).

We, however, decline Anderson's invitation. In Isler, 429 F.3d at 29, we were presented with the opportunity to adopt the position that the D.C. Circuit articulated in Brisbane. We elected not to do so, noting that Brisbane was "a case from another circuit that concedes it is expressing a minority view and is explicitly at odds with this circuit's precedent." Id. Moreover, even if we were now inclined to disregard Isler and adopt the approach of the D.C. Circuit in Brisbane, we would not be free to do so. See United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991) ("[w]e have held, time and again, that in a multi-panel circuit, prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent").

As a last point, we only wish to point out that rather than follow the approach articulated by the Brisbane court, we have consistently interpreted § 841(b)(1) in a more "literal" manner. We have held that "the term 'cocaine base' clearly defines a substance differing from other forms of cocaine." United States v. Barnes, 890 F.2d 545, 552 (1st Cir. 1989); see also Isler, 429 F.3d at 29; Robinson, 144 F.3d at 108-09. Moreover, although § 841 (b)(1) does not define "cocaine base," we held in López-Gil, 965 F.2d at 1134, that the term, as used in the statute, includes all

forms of cocaine base, including but not limited to crack cocaine. Since, as discussed above, the district court found that Anderson was found guilty of distributing 6.1 grams of crack cocaine, it is clear that Anderson was properly sentenced under the "cocaine base" provision of § 841(b)(1). Therefore, the district court was correct in finding that the five-year mandatory minimum applied in Anderson's case.

### III. Conclusion

For the reasons stated above, we affirm the judgment of the district court.

**<u>Affirmed</u>**.