# United States Court of Appeals
## For the First Circuit

No. 15-2169

UNITED STATES OF AMERICA,

Appellee,

v.

LEONER MARTÍNEZ-LANTIGUA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Víctor A. Ramos-Rodríguez, with whom Wilfredo Díaz-Narváez, were on brief, for appellant.
Mainon A. Schwartz, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

May 23, 2017

**TORRUELLA**, **Circuit Judge**.  Following a trial, Leoner Martínez-Lantigua ("Martínez") was found guilty of conspiracy to possess with intent to distribute and possession with intent to distribute at least 15 kilograms but less than 50 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846.  Martínez was sentenced to 121 months of imprisonment. Martínez appeals, contending that the evidence was insufficient for his conspiracy conviction and there were errors at his trial. Because the entire drug deal was captured on video and audio -- which show Martínez inspecting the drugs with his own hands -- we find that there was sufficient evidence to convict Martínez.  We also find Martínez's claims that there were errors at his trial to be without merit.  We therefore affirm.

## I.  Background

On July 6, 2014, a confidential informant told Homeland Security Investigations ("HSI") agents that a money laundering and drug trafficking organization was seeking assistance to transport cocaine from St. Thomas to Puerto Rico.  That same day, an HSI undercover agent (the "Agent"), acting as a facilitator, called the organization and coordinated a meeting to discuss the smuggling venture.

On July 7, the Agent met with Oscar De la Cruz ("De la Cruz") and Pedro Wipp-Kelley ("Wipp-Kelley") in Piñones, Puerto

Rico, to discuss the venture and agreed that, in exchange for transporting the narcotics, they would pay the Agent $1,000 per kilogram of cocaine in transportation fees, plus $5,000 in fuel and travel expenses. During a series of recorded calls and meetings, they ultimately agreed to have the Agent transport 48 kilograms of cocaine and provided him with a Blackberry and the phone number of Erasmo Martínez-Trinidad ("Martínez-Trinidad"), who had the narcotics in St. Thomas. The Agent travelled to St. Thomas and successfully arranged the delivery of the narcotics.

The Agent called Wipp-Kelley on July 12 to arrange the location for the exchange. The exchange took place at the Martínez Nadal Train Station parking lot, in San Juan, Puerto Rico, and was recorded on video; accompanying audio was provided through a body wire that the Agent was wearing.

The controlled delivery involved four cars. Wipp-Kelley messaged the Agent and informed him that Wipp-Kelley would be driving a grey Nissan, and that he would be with somebody (who was later identified as Carlos Carmona). Wipp-Kelley also informed the Agent that a second vehicle, a white Altima, would be involved in the transaction. It would later turn out that Martínez would be driving this Altima, with his friend Ramón Coplin in the passenger seat. Another undercover agent would drive a small SUV to the transaction with the Agent in the passenger seat. The sham

cocaine would be located in a separate red undercover vehicle (the agents naturally did not bring the real cocaine to the transaction). The money would be put into the small SUV, and Martínez would drive away in the red undercover vehicle that contained the narcotics.

The transaction followed this plan (except, of course, that the conspirators were arrested before they could drive away). The Agent got out of the SUV and approached Wipp-Kelley's vehicle, the grey Nissan. Wipp-Kelley told the Agent that the bag containing the $43,000 was in the rear seat of this grey Nissan. After the Agent inspected the bag of money and confirmed its contents, Carmona placed it in the small SUV. The Agent then approached the white Altima. Martínez was in the driver's seat, and Coplin in the passenger seat. The Agent asked Martínez whether he was going to drive the red vehicle and Martínez nodded his head. The Agent asked Martínez whether anyone was going "to check that," referring to the sham narcotics in the vehicle. Martínez replied "[o]h, okay." Both Martínez and Coplin approached the Agent's vehicle to inspect the bags and the Agent opened the trunk. The Agent opened the bag containing the bricks of sham cocaine to show them to Martínez. Martínez looked into the trunk, reached into the trunk, and touched the sham narcotics. After Martínez had completed this inspection of the sham cocaine, the Agent closed

the trunk of the vehicle, which signaled federal agents to arrest the conspirators.

After the arrest, Martínez waived his Miranda rights at the police station and admitted that he was hired to move the vehicle containing the bags from Point A to Point B for $1,000, and that he knew that he was to move something illegal because of the amount of money that he was offered.

Martínez was tried from May 11 to May 19, 2015. He was found guilty of conspiracy to possess with intent to distribute and possession with intent to distribute at least 15 but less than 50 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Martínez was sentenced to 121 months of imprisonment. Martínez appeals, contending that the evidence was insufficient for his conviction and his trial was unfair.

## II. Discussion

### A. Sufficiency of the Evidence

Martínez's principal argument on appeal is that the evidence was insufficient for his conviction. "We review preserved challenges to the sufficiency of the evidence de novo." United States v. Maymí-Maysonet, 812 F.3d 233, 236 (1st Cir. 2016) (citation omitted), cert. denied, 137 S. Ct. 100 (2016). On sufficiency of evidence review, this Court "must view the evidence, both direct and circumstantial, in the light most favorable to the

prosecution, and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." Id. (citation omitted). "Given this difficult standard, defendants raising this claim are 'rarely successful . . . .'" United States v. Rivera-Ruperto, 846 F.3d 417, 432 (1st Cir. 2017) (quoting United States v. Moran, 984 F.2d 1299, 1300 (1st Cir. 1993)). For conspiracies such as the one Martínez was convicted for, "the government 'need only prove that the defendant had knowledge that he was dealing with a controlled substance, not that he had knowledge of the specific controlled substance.'" Id. at 433 (quoting United States v. Woods, 210 F.3d 70, 77 (1st Cir. 2000)).

Martínez concedes that he knew that he was doing something illegal, and he concedes that he was paid $ 1,000 for doing so. Martínez, however, contends that he did not know that he was part of a criminal conspiracy, or that the conspiracy involved illegal drugs. The video recording belies Martínez's arguments. He was caught on tape arriving in the white Altima, the car that Wipp-Kelley had said he would arrive in, at the exact location and at the exact time that the drug deal was to take place. Not only did he look into the trunk of the undercover vehicle -- with the unzipped bag of drugs inside it -- but he also

-6-

touched the bricks of sham cocaine with his hands.  Only after Martínez had completed this inspection did the Agent close the trunk, which was the signal for the police to appear.  We have no difficulty in finding that such evidence is sufficient to allow a rational fact-finder to conclude beyond a reasonable doubt that Martínez knew not only that he was part of a conspiracy to do something illegal, but also that the conspiracy involved a narcotics deal.

**B.  Other Alleged Trial Irregularities**

Martínez raises a number of additional issues, none of which are of any avail to him.

According to Martínez, the transcript of the audio that accompanied the surveillance video was not properly authenticated. The transcript was authenticated by the Agent's testimony on the third day of the trial.  "Because authentication rulings are necessarily fact-specific, we review such rulings only for mistake of law or abuse of discretion."  United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997) (citation omitted).  This Court has "discern[ed] no problem with" the authentication of a transcript by an officer who was personally involved in recording the transmissions coming from an electronic transmitting device worn by an informant during a drug transaction and who "compared the transcript to the tape recording and testified that the transcript

fairly and accurately represented the conversation on the tape," even though the officer did not prepare the transcript. United States v. Anderson, 452 F.3d 66, 77 (1st Cir. 2006). Indeed, the officer is "in an even better position" to authenticate the transcript because "he himself had listened to the conversation . . . while monitoring the controlled [transaction]." Id. And "if the appellant was so concerned about the authenticity of the government's transcript, he could have submitted his own." Id. Martínez never submitted his own transcript. Rather, on the first day of trial, he agreed with the government to use the transcript and to let the Agent identify the speaker.

Martínez also seeks to convince this court that the trial testimony of a firearms and ammunition expert was not relevant and caused a prejudicial effect. The expert testified that two Smith & Wesson pistols seized from Martínez's co-conspirators were both functioning firearms, and also as to such basic matters as their caliber and how many bullets their magazines could hold. Even assuming that Martínez preserved this issue, and we would therefore review for abuse of discretion, we fail to discern any such abuse here. See United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000); United States v. Sebaggala, 256 F.3d 59, 65 (1st Cir. 2001) ("When the issue is whether expert testimony will (or will not) materially assist a jury . . . trial courts enjoy considerable latitude in

deciding whether to admit or exclude it."). Firearms are a common tool of the drug trade. Firearms -- and expert testimony about them -- can therefore be relevant circumstantial evidence towards establishing the existence of a drug conspiracy. See United States v. Rivera Calderón, 578 F.3d 78, 94 (1st Cir. 2009).

Martínez next takes issue with jury instruction number 13, because, so he claims, it did not contain the third element of a conspiracy charge, namely that "the defendant knowingly and voluntarily participated in the conspiracy." United States v. Maryea, 704 F.3d 55, 73 (1st Cir. 2013). Although jury instruction 13 did not explicitly state that "voluntary participation" was the third element of the offense, it did state that the jury needed to determine whether Martínez "willfully joined in the agreement." The instruction clarified: "To act 'willfully' means to act voluntarily and intelligently and with the specific intent that the underlying crime be committed." This instruction was sufficient. See United States v. Allen, 670 F.3d 12, 17 (1st Cir. 2012) (holding identical language to be sufficient conspiracy instruction under 18 U.S.C. § 371).

Finally, Martínez takes issue with jury instruction number 16, because he believes that a jury instruction for willful blindness was not warranted. Such an instruction is appropriate if: "[1] a defendant claims a lack of knowledge, [2] the facts

suggest a conscious course of deliberate ignorance, and [3] the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge." United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005) (alterations in original) (citation omitted). These three requirements are present here: (1) Martínez claimed that he lacked knowledge of the conspiracy -- indeed, he presses this argument again on appeal; (2) Martínez knew that he was hired to do something illegal, but he argued below -- and presses this on appeal as well -- that he did know what that illegal conduct was, which suggests that he remained deliberately ignorant; (3) the jury was instructed that "you may infer [Martínez] had knowledge of a fact if you find that he deliberately closed [his] eyes to a fact that otherwise would have been obvious to [him]." (emphasis added); "[i]t is entirely up to you to determine whether he deliberately closed his eyes to the fact and, if so, what inference, if any, should be drawn;" and "mere negligence or mistake in failing to learn the fact is not sufficient. There must be a deliberate effort to remain ignorant."

## III.  Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

**Affirmed.**

-10-